

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00051-CV

_____

BUILDER RECOVERY SERVICES LLC, Appellant

V.

THE TOWN OF WESTLAKE, TEXAS, Appellee

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-304811-18

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion on Remand by Justice Bassel

## MEMORANDUM OPINION ON REMAND

## I. Introduction

This appeal involves ordinances enacted by Appellee The Town of Westlake, Texas, that imposed on commercial solid waste operators, such as Appellant Builder Recovery Services LLC (BRS), a license requirement and a license fee calculated on a percentage of the licensee's gross revenue. This is our second opinion in this matter. In our prior opinion, we held that the Town was empowered to require a license of commercial solid waste operators and that the power to require a license was not preempted by state law. *See Builder Recovery Servs. LLC v. Town of Westlake* (BRS I), 640 S.W.3d 543, 560–69 (Tex. App.—Fort Worth 2021) (mem. op.), *overruled by Builder Recovery Servs., LLC v. Town of Westlake* (BRS II), 650 S.W.3d 499 (Tex. 2022). We held that the issue of the propriety of the license fee was moot. *Id.* at 570–72. The Texas Supreme Court granted review of our judgment and held that the issue of the propriety of the license fee was not moot and then held that the Town lacked the power to impose a license fee calculated on the basis of BRS's gross revenues. *BRS II*, 650 S.W.3d at 503–04. The Texas Supreme Court remanded the appeal to us to determine whether the licensing provisions in the Town's ordinances were severable from the invalidated license fee and thus whether the licensing provisions survived the Texas Supreme Court's holding. *Id.* at 507–08.

We ordered rebriefing on remand, and BRS raised five issues. The first contends that one of the Town's ordinances should be invalidated in its entirety as

well as portions of another. We hold that certain provisions of the ordinances requiring a license that are challenged by BRS are not severable from the license-fee provisions and thus do not survive the Texas Supreme Court's invalidation of the license fee. The disposition of the first issue obviates the need to reach BRS's second, third, and fourth issues.[1] We also sustain BRS's fifth issue that seeks a remand to the trial court on the issue of attorney's fees; the parties agree that events that have occurred since the trial court's initial fee award require a remand to address how those events have impacted the trial court's original fee award.

## II. Factual and Procedural Background

Our prior opinion and that of the Texas Supreme Court thoroughly outline the facts of the controversy. We will not rehash those prior writings and will only give a bullet-point description of the underlying facts. In addition, and to give context to the evolution of the issues and our holding in this opinion, we will summarize the holdings of our prior opinion in this matter and that of the Texas Supreme Court.

### A. We set forth the underlying facts relevant to this opinion on remand from the Texas Supreme Court.

The underlying facts relevant to the question of severability between the licensing provisions of the Town's ordinances and the license fee contained in those ordinances are as follows:

---

[1]The Texas Supreme Court indicated that the matters raised in the second, third, and fourth issues would need to be addressed only if we concluded that the provisions of the ordinances were severable. *See BRS II*, 650 S.W.3d at 507–08.

3

- BRS is in the business of hauling away construction waste from homebuilders' work sites.

- BRS raised an issue with the Town regarding whether Republic Services, the franchised waste hauler for the Town, would have the exclusive right to remove the construction waste that BRS was also in the business of hauling and whether "the Town ha[d] the authority to mandate private contracts of construction waste hauling on private property."

- BRS had a workshop with the Town council about providing construction waste services to builders, and the council directed Town staff to discuss possible amendments to solid waste ordinances to address the issues raised by BRS. Discussions ensued, and Town staff indicated that if BRS would acquiesce to voluntary license participation, the staff would recommend a 3% license fee. When BRS did not agree to the fee, BRS's representative stated, "[Town staff] were going to pass the ordinance as drafted in that form at the time with a fee that would be higher than Republic's, which ended up being 15 percent."

- BRS claimed that it had objected to both the Town's indication that it would accord BRS special treatment and the Town's assertion that it had the authority to charge a license fee based on a percentage of gross revenue.

4

- The Town eventually enacted Ordinance No. 851 that amended the Town's solid waste ordinances, which are found in Chapter 74 of its Code of Ordinances. *See* Westlake, Tex., Ordinance 851 (Apr. 30, 2018); Westlake, Tex., Code of Ordinances ch. 74, art. III, §§ 74-41–74-48, 74-50 (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=COOR_CH74SOWA_ARTIIICOSOWALIWAREMAOP.[2] This ordinance contained a license fee calculated at 15% of the waste hauler's gross revenue for waste collected within the Town.

- In our prior opinion, we described the other operative features of Ordinance No. 851 that were incorporated into Chapter 74 as follows:

  > The ordinance not only contained the license fee but also regulated several aspects of how the companies that obtained a commercial solid waste operator license were to conduct their business and to provide information to the Town. *See generally id.* § 74-46. The various other features of the ordinance included the following:
  >
  > > • "[I]t shall be the mandatory duty of any person owning or having control over any property where construction requiring a building permit is taking place and where the construction is being performed in relation to a residential structure . . . , prior to the start of construction, to place upon the property a dumpster, provided by the [T]own's franchised or licensed waste collector" and to place various items of waste in it. *Id.* § 74-5(a).

---

[2]The electronic version of the Town's ordinances states that it is current as of January 19, 2023.

> • The dumpster should be placed in a location where it is screened from public view and "removed from the building site immediately upon the completion of construction." *Id.*
>
> • Licensees are to label their vehicles and containers with the license number issued by the Town, to maintain their vehicles and containers, to prevent spills or leaks, to clean up spills or leaks, and to maintain insurance. *See id.* § 74-46(a), (c), (d), (e), (g).
>
> • Licensees are required to maintain their Town licenses, maintain certain records, permit the Town to examine their records, and to submit reports detailing the amount of waste collected, where it was disposed of, and the amount disposed of; the revenue generated; and the names of customers and the services provided to them. *See id.* § 74-46 (i), (j), (k), (l).

*BRS I*, 640 S.W.3d at 549–50.

- Once the ordinance was implemented, BRS challenged the Town's authority to require a license and to charge a license fee. The Town defended the fee as being a recoupment of administrative expenses—a claim that BRS also challenged. BRS's representative claimed that when he had asked Town staff what the basis was for coming up with the license fee, he was told that there was none. And both before and after enactment of the ordinance, the Town prepared no estimate of the cost to administer the licensing provisions of the ordinance.

- The Town's representative later testified that the license fee for temporary construction waste haulers was designed to cover the administrative and oversight costs of solid waste services. In addition, the fee was designed to address damage to the Town's streets. The representative acknowledged that the Town had done no investigation with respect to BRS's on-site activities. Indeed, the following occurred in an exchange between BRS's counsel and the representative:

  > Q. And the -- there's really no administrative cost per se, right, because it's really that -- other than accepting money through checks, there's no real administration at this point, right?

  > A. No.

  The representative testified that if there were a spill from a BRS dumpster, the Town would investigate the spill, but the representative was unaware of any spills by a BRS vehicle.

- BRS's counsel also examined the Town's representative at trial about information contained on the Town's website regarding the requirements for a construction waste license and how that website referred to the Town's contractor registration page. BRS's counsel noted that other contractors were charged a flat $250 registration fee, which the Town's representative believed was the cost to administer the

7

registration process. The representative testified that it took approximately ten minutes to process a construction waste license.

- After BRS refused to obtain a license, the Town first notified BRS that it needed to come into compliance with the ordinance and then cited BRS for violating the ordinance. In response, BRS sued the Town seeking declarations that the ordinance was invalid and that the license fee constituted an unconstitutional occupation tax and requesting a temporary injunction to prevent enforcement of the ordinance.

- After a bench trial, the trial court concluded that the license fee was "unlawful and invalid under Section 361.0961 of the Texas Health and Safety Code." *See* Tex. Health & Safety Code Ann. § 361.0961.

- Before the rendition of judgment, the trial court conducted a hearing on attorney's fees. At that hearing, the Town announced that it had passed a new ordinance—Ordinance No. 901—that reduced the license fee to 3% of the construction waste hauler's gross revenue but left the other operative features of the licensing scheme intact. *See* Westlake, Tex., Ordinance 901 (Dec. 2, 2019) (amending § 74-47(a)). The trial court concluded on the record at the attorney's fee hearing that the 3% fee was "fair."

8

- The trial court then entered a judgment that contained the following declarations:

Count 1

Regarding the claims in Count 1 of [BRS's] First Amended Petition, the [c]ourt rules as follows:

1. As to [BRS's] request for declaratory judgment that "the Town has no authority under Section 364.034, Tex. Health & Safety Code,[3] or other statute or Texas constitution to require a private operator to obtain a franchise[ or a] license[] or [to] pay fees to provide temporary solid waste collection services to a construction site within the Town's limits and any such requirement is invalid," the [c]ourt RENDERS judgment in favor of [the Town] and hereby orders that [BRS] take nothing as to that claim.

2. As to [BRS's] request for declaratory judgment that "Section 74-4, et seq., is invalid under Section 364.034, Tex. Health & Safety Code, to the extent the Town restricts the collection of temporary solid waste from construction sites to the Town's franchisees and licensees," the [c]ourt RENDERS judgment in favor of [the Town] and hereby orders that [BRS] take nothing as to that claim.

3. As to [BRS's] request for declaratory judgment that "Section 74-4, et seq., is preempted by and invalid under Section 361.0961, Tex. Health & Safety Code[,]"[4] the [c]ourt RENDERS judgment

---

[3]Section 364.034 "deals with the franchising of waste services, the ability to force citizens to use those services, and the exceptions to this franchising power," and our prior opinion described the statute's various sections in detail. Tex. Health & Safety Code Ann. § 364.034; *see BRS I*, 640 S.W.3d at 560.

[4]Section 361.0961 provides that

(a) A local government or other political subdivision may not adopt an ordinance, rule, or regulation to:

9

in favor of [the Town] and hereby orders that [BRS] take nothing as to that claim.

4. As to [BRS's] request for declaratory judgment that "the 15% license fee under Section 74-44, et seq., is unlawful and invalid under Section 361.0961(a)(3), Tex. Health & Safety Code," the [c]ourt RENDERS judgment in favor of [BRS] and hereby declares that a 15% license fee as set forth by Ordinance No. 851 is unreasonable[,] null[,] and void. On this sole count[,] [BRS] is awarded reasonable attorney's fees pursuant to Section 37.[009,] Tex. Civ. Prac. & Rem. Code[,] in the sum of $8,523[,] which the [c]ourt finds reasonable and necessary and just and equitable. [BRS] shall have post-judgment interest on such amount at the maximum allowable rate of interest.

---

(1) prohibit or restrict, for solid waste management purposes, the sale or use of a container or package in a manner not authorized by state law;

(2) prohibit or restrict the processing of solid waste by a solid waste facility, except for a solid waste facility owned by the local government, permitted by the commission for that purpose in a manner not authorized by state law; or

(3) assess a fee or deposit on the sale or use of a container or package.

(b) This section does not prevent a local government or other political subdivision from complying with federal or state law or regulation. A local government or other political subdivision may take any action otherwise prohibited by this section in order to comply with federal requirements or to avoid federal or state penalties or fines.

(c) This section does not limit the authority of a local government to enact zoning ordinances.

Tex. Health & Safety Code Ann. § 361.0961.

Count 2

> Regarding the claim in Count 2 of [BRS's] First Amended Petition, as to [BRS's] request for declaratory judgment that "Section 74-44, et seq., of Ordinance [N]o. 851 establishing the 15% license fee[] is an unconstitutional occupation tax and is invalid," the [c]ourt RENDERS judgment in favor of [the Town] and thereby orders that [BRS] take nothing as to that claim.

- The trial court awarded BRS ten percent of the trial attorney's fees that it had sought and no appellate fees.

## B. We set forth the holdings of our prior opinion in this matter.

BRS appealed the trial court's judgment to this court. We summarized the issues raised by the parties in the prior appeal as follows:

> In four issues, BRS argues that (1) the Town lacks the statutory authority to require a license or to impose a license fee on commercial solid waste operators who are the subject of the ordinance, (2) any right the Town has to require a license or to impose a fee is preempted by another Texas statute, (3) the license fee is an invalid occupation tax, and (4) the trial court erred in the amount of attorney's fees that it awarded BRS. In its appeal, the Town raises two points challenging (1) the trial court's declaration that the license fee is invalid and (2) the trial court's award of attorney's fees to BRS.

*BRS I*, 640 S.W.3d at 547.

> In turn, we resolved those issues with the following holdings:

1. The Town has statutory powers that carry with them the right to license commercial solid waste operators, and another statute dealing with the franchise of waste disposal operators does not deprive the Town of the power to license those operators.

2. The Town's act of licensing a commercial solid waste operator does not fall within the ambit of a Texas statute that restricts the

11

use of containers, and that statute does not preempt the Town's ability to require a license or to impose a license fee.

3. The Town repealed the 15% license fee that BRS challenged, and this action moots BRS's challenge to the fee's validity as BRS's challenge is predicated on the amount of the fee.

4. Our disposition of the various issues raised by the parties requires that we reverse and remand the issue of attorney's fees to the trial court.

*Id.* at 548.

## C. We set forth the holdings of the Texas Supreme Court in its opinion in this matter.

BRS sought review of our judgment, which the supreme court granted. The supreme court reversed our judgment by writing on a legal question that had not been raised in the trial court or in the issues that were presented to this court. *BRS II*, 650 S.W.3d at 501. The primary thrust of the supreme court's opinion examined what powers the Town was accorded under Section 363.111 of the Health and Safety Code, which permits general-law municipalities to "adopt rules for regulating solid waste collection, handling, transportation, storage, processing, and disposal." *Id.* at 504. The issue was whether this statute supported the Town's argument that "its statutory authority to regulate must include both the power to require regulated companies to obtain a license and the power to charge a regulatory fee to recover the cost to the Town of administering the regulations." *Id.*; *see also* Tex. Health & Safety Code Ann. § 363.111(a).

12

As a starting point, the supreme court assumed, but did not decide, that the Town could require a construction trash hauler, such as BRS, to obtain a license. *BRS II*, 650 S.W.3d at 505. Then, the supreme court concluded that "the dispositive issue before [it was] whether the Town ha[d] authority to charge *the kind of licensing fees* it ha[d] charged." *Id.* (emphasis added).

The supreme court resolved the issue it posed in the negative and supported its resolution with the following rationale:

- The supreme court assumed that "the express power to regulate include[d] an implied power to charge regulatory fees." *Id.* But that power would only support a fee calculated "to cover regulatory costs"—only for a fee calculated on that basis "can there be any argument that the power to charge the fee is 'indispensable' to the power to regulate." *Id.*

- After discussing the possibility that a fee based on the volume of trash hauled by BRS might meet its regulatory cost standard, the supreme court concluded that "a floating, percentage-of-revenue fee will fluctuate based on economic forces having nothing to do with the Town's internal costs" and was not permissible. *Id.* The power to charge a percentage-of-revenue licensing fee could not be implied from the power to

13

regulate, and such a fee also smacked of being an unconstitutional occupation tax. *Id.* at 505–06. The supreme court summarized its holding as follows: "the Town's express power under [S]ection 363.111 to regulate trash hauling does not include an implied power to charge percentage-of-revenue licensing fees." *Id.* at 506.

After rejecting the argument that another provision of the Health and Safety Code authorized a percentage-of-revenue fee, the supreme court turned to what it viewed as an open question that impacted the overall viability of the Town's licensing scheme for "trash haulers' activities," i.e., "what remains of the Town's regulatory scheme in the absence of the fee." *Id.* That question turned on whether the remainder of the ordinance that created the license scheme was "severable from the fee." *Id.* at 507. The Court set out the general rule of severability by stating that

> the invalid portion of an ordinance or statute should be severed from the rest of the enactment, which remains in effect without the severed portion, "unless all the provisions are connected in subject[ ]matter, dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the legislature would have passed the one without the other."

*Id.* (first quoting *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (op. on reh'g); then quoting *W. Union Tel. Co. v. State*, 62 Tex. 630, 634 (1884)).

After stating the general rule of severability, the supreme court offered its view that "the prospect that the licensing requirement remains viable in the absence of its accompanying fee seems remote." *Id.* It seemed apparent to the supreme court that

the fee and the "regulatory scheme" were a package deal. *Id.* But the opinion also noted that the Court's view might be impacted by the presence of a severability clause in the ordinances. *Id.*

On remand to this court, the supreme court tasked us with sorting out the severability question. *Id.* at 507–08. The supreme court noted that a conclusion that the licensing provisions of the ordinances were severable would implicate additional questions regarding the Town's power "to require trash haulers to obtain a license" and whether the ordinances were preempted by another provision of the Health and Safety Code. *Id.*[5]

### III. Analysis

In its first issue on remand, BRS argues that Ordinance No. 901 should be struck in its entirety, as well as certain provisions of Ordinance No. 851 that contain the requirement that BRS obtain a license to perform its waste hauling business in the Town. What follows dissects primarily various sections of Ordinance No. 851 based on the challenges actually made by BRS, the concessions it makes in its brief, and our conclusions about which specific licensing provisions are not severable from the invalidated sections of Ordinance No. 851 containing the license-fee requirement and how those conclusions impact Ordinance No. 901. Overall, we agree with BRS that

---

[5]As the description of our prior opinion noted above, we have already answered these subsidiary questions.

15

the provisions containing the licensing requirements are not severable from those containing the license fee.

**A.    We set forth our view regarding which provisions of the Town's ordinances are actually in controversy.**

Initially, we note that the Town engages in a strenuous defense of portions of its ordinances that BRS does not appear to attack.   As set forth above, we deal primarily with Ordinance No. 851, which regulates "solid waste."   The ordinance has four articles titled as follows:

Article I      General Requirements

Article II     Residential

Article III    Commercial Solid Waste, Liquid Waste, and Recyclable Materials Operators

Article IV    Penalty

*See* Westlake, Tex., Ordinance 851 (Apr. 30, 2018).

Thus, Ordinance No. 851 covers a host of types of solid waste other than the commercial solid waste that BRS is in the business of hauling; however, Article III of the ordinance focuses on regulating commercial solid waste.  The Town spends much of its brief arguing that the provisions of Articles I, II, and IV are severable from the license fee provisions invalidated by the supreme court and thus survive.  The Town then devotes only two pages of specific discussion to the provisions of Article III that contain the offending license-fee provision and the other aspects of the Town's regulation of commercial solid waste.  Why the Town engages in this broad-ranging

16

defense is unclear; BRS's brief focuses its attack solely on Article III. Specifically, BRS's brief states, "Ordinance No. 851 contains provisions impacting all different types of solid waste collection within the [Town]. Article III contains the requirements for commercial solid waste, liquid waste[,] and recyclable materials collection operators. *BRS is only challenging those provisions in Article III that apply to residential construction waste haulers*." [Emphasis added.]

Further, the focus of the supreme court's hypothetical about how its invalidation of the license fee impacted other provisions of the ordinance also focused on Article III. That opinion noted,

> Having held the licensing fee invalid because it exceeds the Town's statutory authority, we must assess what remains of the Town's regulatory scheme in the absence of the fee. As described above, Article III of the [o]rdinance included the licensing requirement, the percentage-of-revenue licensing fee, and various regulations governing trash haulers' activities. BRS challenges all three elements of Article III, and we hold that the percentage-of-revenue licensing fee exceeds the Town's authority.

*BRS II*, 650 S.W.3d at 506.

Thus, we will focus our severability analysis using the same focus as BRS and the supreme court. We will decide which provisions of Article III are severable from those invalidated by the supreme court and whether those Article III provisions survive in the face of the Court's holding, which invalidated the license fee that the Town had enacted for commercial solid waste operators.

17

**B.** **We set forth the test that applies to determine whether the licensing provisions of the Town's ordinances are severable from the license-fee provisions.**

As we noted above, the supreme court stated its initial view of the interconnectedness of the license fee and the licensing regulations of construction trash hauling and how that interconnectedness led the Court to surmise that the license provisos were not severable. But the supreme court counterbalanced its statements about the interrelatedness of the fee and the licensing regulations by noting that the ordinances also contained a severability clause. *Id.* at 507. In the supreme court's words, "[n]evertheless, the [o]rdinance contains a severability clause, and '[w]hen an ordinance contains an express severability clause, the severability clause prevails when interpreting the ordinance.'" *Id.* (quoting *City of Houston v. Bates*, 406 S.W.3d 539, 549 (Tex. 2013)).

Pivoting off the supreme court's mention of the severability clause, the Town emphasizes various provisions of the Government Code that speak to the guidance that should be drawn from the presence of a severability clause and also notes the general and long-standing test for severability. In essence, we conclude that though the Government Code does accord the existence of a severability clause some weight, the basic test of severability remains focused on whether the provisions that remain after striking an invalidated provision are complete in themselves and capable of being executed in accordance with legislative intent.

We begin by quoting the provisions of the Code Construction Act and the construction rules for civil statutes dealing with severability. The severability provision of the Code Construction Act provides,

> (a) If any statute contains a provision for severability, that provision prevails in interpreting that statute.
>
> (b) If any statute contains a provision for nonseverability, that provision prevails in interpreting that statute.
>
> (c) In a statute that does not contain a provision for severability or nonseverability, if any provision of the statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application, and to this end the provisions of the statute are severable.

Tex. Gov't Code Ann. § 311.032.

> The construction rules for civil statutes provide,
>
> (a) Unless expressly provided otherwise, if any provision of a statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application, and to this end the provisions of the statute are severable.
>
> (b) This section does not affect the power or duty of a court to ascertain and give effect to legislative intent concerning severability of a statute.

*Id.* § 312.013.

To say that these rules present a mixed bag is an understatement. For example, Section 311.032(a) states that "[i]f any statute contains a provision for severability, that provision prevails in interpreting that statute." *Id.* § 311.032(a). But that does

19

not tell us *what* it prevails over. In turn, Section 312.013(a) presents a general test for severability "[u]nless expressly provided otherwise." *Id.* § 312.013(a). We conclude that the presence of a severability clause is not conclusive on the question of whether provisions impacted by the invalidation of another provision remain viable. Practically, giving a severability clause veto power over the question of whether other provisions were unseverable would permit provisions clearly tied together by language and legislative intent to survive even though the basis for that interrelated package of provisions no longer existed and the apparent intent that one would not have been enacted without the other. In that circumstance, a severability clause would be allowed to preserve provisions that would never have been enacted had the enacting body known that an integral part of what it had enacted was invalid. To give the severability clause the final say in such a circumstance elevates form over substance.

The Town appears to acknowledge that a severability clause provision does not carry a veto power. Indeed, the Town describes Section 311.032(a) and other sections of the Code Construction Act that it cites as creating presumptions. We agree with this characterization. We do not view the presence of a severability clause as being a mandate that prevents us from assessing the severability question based on whether other provisions of Article III of the ordinance can function without the invalidated provision or if the Town would have enacted Article III if it had understood that it could not assess a license fee based on a percentage of BRS's revenue.

20

To support this view, we note that one of the most often cited Texas Supreme Court opinions dealing with severability in a statutory context is the *Rose* case mentioned above. 801 S.W.2d at 847. *Rose* involved a question regarding whether the Court's prior holding—that invalidated damage limitations in the Medical Liability Act (MLA) on common law medical-malpractice claims—also invalidated the limitations when applied to statutory wrongful-death claims. *Id.* at 842–43. The supreme court conducted a severability analysis and first noted that the MLA contained a severability clause stating "in part that if the application of the statute to any person or circumstance is held unconstitutional, then the effect of the invalidation shall be confined to the portion of the statute adjudged to be unconstitutional." *Id.* at 844.

But the Court did not give conclusive effect to the clause and stated that its presence only prompted a more involved analysis applying the Court's long-standing rules for determining severability:

> The goal of this severability clause, to retain valid portions and applications of the statute whenever possible, reflects the case law's reminder that "[i]n the construction of statutes, if it can be lawfully done, it is the duty of the court to construe a statute so as to render it valid." *Sharber v. Florence*, . . . 115 S.W.2d 604, 606 ([Tex.] 1938). In *Western Union Telegraph* . . . , we acknowledged that some statutes are severable while others are not and stated the test for determining when a finding of unconstitutionality of one portion of a statute invalidates the whole statute:
>
> > When, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it

21

cannot be presumed the legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial[,] but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.

[62 Tex.] at 634.

*Id.* at 844.

Chief Justice Phillips's dissent in *Rose* also highlighted that a severability clause

is not conclusive on the question of severability:

In embarking upon a severability analysis, the primary focus must be on the intention of the legislature. *See* N. Sanger, *Sutherland Statutory Construction* § 44.03 (Sands 4th ed. 1986 rev.). Indeed, it is the "duty of a court to ascertain and give effect to legislative intent concerning severability of a statute." Tex. Gov't[] Code Ann. § 312.013 . . . . "The test for severability in the absence of an express severability clause is one of legislative intent." . . . *Ass*['*n*] *of Tex*[.] *Prof*['*l*] *Educators v.* . . . *State Comm*['*r*] *of Educ*[.], 788 S.W.2d 827, 830 (Tex. 1990). Conversely, the existence of a severability clause is an aid to finding such a legislative intent. It is not, however, conclusive. As Justice Brandeis said in *Dorchy v.* . . . *Kansas*, 264 U.S. 286, 290, 44 S. Ct. 323, 324–25 . . . (1924), a savings clause provides a rule of construction [that] may aid in determining legislative intent, but "it is an aid merely; not an inexorable command."

. . . .

The inquiry, therefore, is whether "the invalid part is so intermingled with all parts of the act as to make it impossible to separate them, and so

22

preclude the presumption that the [Texas] Legislature would have passed the act anyhow." *Sharber*, . . . 115 S.W.2d [at] 606 . . . .

*Id.* at 850 (Phillips, C.J., dissenting).[6]

The San Antonio Court of Appeals recently reached a similar conclusion to *Rose*. In analyzing a City of San Antonio ordinance mandating that private employers provide paid sick leave to their employees, the San Antonio court concluded that the existence of a severability clause did not have conclusive effect on the severance issue. *Washington v. Associated Builders & Contractors of S. Tex. Inc.*, 621 S.W.3d 305, 322 (Tex. App.—San Antonio 2021, no pet.). The City of San Antonio's ordinance had a severance provision substantially similar to the one included in the Town's ordinances.[7] Citing the Code Construction Act section that we have quoted and the

---

[6]Admittedly, the Texas Supreme Court at times seems to accord a severability clause controlling force in resolving a severability question. For example, when dealing with a City of Houston ordinance, the supreme court noted that the ordinance contained a severability clause and held that "[b]ased on the severability clause, the invalidity of provisions that limit the availability of premium pay when calculating termination pay do not affect the validity of any of the remaining portions of the ordinances or any other ordinances." *Bates*, 406 S.W.3d at 549. Even in light of such a broad holding in *Bates*, we view the guidance of *Rose* and the Court's statements in its opinion remanding the present appeal to us as meaning that a severance clause does not have controlling force when there is the close interrelationship described in *Western Union*.

[7]The severability provision in the San Antonio ordinance provided,

It is hereby declared to be the intention of the city council that the sections, paragraphs, sentences, clauses[,] and phrases of this chapter are severable, and if any phrase, clause, sentence, paragraph[,] or section of this chapter shall be declared unconstitutional by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality

23

same case that the supreme court quoted in *BRS II*, the San Antonio court held that the clause evinced an intent to preserve the part of the statute that was not constitutional:

> The provision makes clear the City[ of San Antonio]'s intent, in the event any portion of the Amended Ordinance is determined to be unconstitutional, that the remainder of the ordinance continue in effect, and the Amended Ordinance's specific provision controls over a general severability rubric. *See* Tex. Gov't Code Ann. § 311.032(a) ("If any statute contains a provision for severability, that provision prevails in interpreting that statute."); . . . *Bates*, 406 S.W.3d [at] 549 . . . ("When an ordinance contains an express severability clause, the severability clause prevails when interpreting the ordinance.").

---

> shall not affect any of the remaining phrases, clauses, sentences, paragraphs[,] and sections of this chapter[] since the same would have been enacted by the city council without the incorporation in this chapter of any such unconstitutional phrase, clause, sentence, paragraph[,] or section.

*Washington*, 621 S.W.3d at 320.

The severability provision in Ordinance No. 851 provides,

> It is hereby declared to be the intention of the Town Council of the Town of Westlake, Texas, that sections, paragraphs, clauses[,] and phrases of this Ordinance are severable, and if any phrase, clause, sentence, paragraph[,] or section of this Ordinance shall be declared legally invalid or unconstitutional by the valid judgment or decree of any court of competent jurisdiction, such legal invalidity or unconstitutionality shall not affect any of the remaining phrases, clauses, sentences, paragraphs[,] or sections of this Ordinance since the same would have been enacted by the Town Council of the Town of Westlake without the incorporation in this Ordinance of any such legally invalid or unconstitutional, phrase, sentence, paragraph[,] or section.

Westlake, Tex., Ordinance 851 (Apr. 30, 2018). Ordinance No. 901 has an identical provision. *See* Westlake, Tex., Ordinance 901 (Dec. 2, 2019).

*Id.* at 320.

The San Antonio court, however, went on to quote *Rose* and other supreme court authority for how it would resolve the severability question even in view of the presence of the severability clause:

> However, if the statute and ordinance conflict, and a portion of the ordinance is unconstitutional, severing the remaining provisions may be proper "[i]f, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected." *Rose . . .* , 801 S.W.2d [at] 844 . . . (quoting *W. Union Tel. . . .* , 62 Tex. [at] 634 . . . ). But if "all the provisions are connected in subject[ ]matter, dependent on each other, [and] operating together for the same purpose . . . [or] they are essentially and inseparably connected in substance," then severance is not proper. *Id.*; *cf. Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 902 (Tex. 2000) (citing *Rose*, 801 S.W.2d at 845).

*Id.* at 320–21.

Applying its pronounced standard, *Washington* concluded that once the provision of the ordinance mandating paid leave was voided because it was preempted by state law, that holding affected virtually every section of the ordinance. In the San Antonio court's view, the remaining "provisions, which do not expressly address paid sick and safe leave, are ancillary provisions whose purpose is to provide the reporting and enforcement provisions for paid sick and safe leave." *Id.* at 322. The San Antonio court offered the following rationale regarding why the doctrine of severance did not save the remainder of the ordinance:

> After the trial court determined that the Amended Ordinance established a wage, it necessarily found that the central purpose of the Amended

25

Ordinance was likely preempted and unconstitutional, and virtually "all the provisions are connected in subject[ ]matter, dependent on each other, [and] operating together for the same purpose." *See* [*Rose*, 801 S.W.2d at 844]. The trial court could not have severed the few remaining provisions because, without the trial court['s] adding words to rewrite the provisions, *see Geeslin v. State Farm Lloyds*, 255 S.W.3d 786, 799 (Tex. App.—Austin 2008, no pet.) (recognizing courts may not "write words into [a] statute"), "that which remain[ed was not] complete in itself, and [was not] capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected." *See Rose*, 801 S.W.2d at 844 (quoting *W. Union Tel. Co.*, 62 Tex. at 634).

*Id.*

Here, even though Ordinance Nos. 851 and 901 contain severability clauses, we will apply the *Western Union* test to the severability question and ask the following: when the unconstitutional portion is stricken out of Ordinance Nos. 851 and 901, is that which remains complete in itself, and is it capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected?[8]

### C. We conclude that the licensing requirements in the ordinances are not severable from the invalid license-fee provisions.

#### 1. We set forth the structure of Article III of Ordinance No. 851.

We begin by setting out the title of Article III of Ordinance No. 851 and listing its internal section numbers and the headings associated with the sections:[9]

---

[8]We will explain later why the limited provisions of Ordinance No. 901 do not survive the severability analysis.

[9]For the reader's reference, we cite to the online version of the Westlake Code of Ordinances, but our list of the section headings contains the inconsistencies in

ARTICLE III. - COMMERCIAL SOLID WASTE, LIQUID WASTE, AND RECYCLABLE MATERIALS OPERATORS

Sec. 74-41    Requirements of Other Ordinances Not Waived

Sec. 74-42. – Commercial solid waste requirements.

Sec. 74-43. – Fees.

Sec. 74-44. – License or franchise required.

Sec. 74-45. – License application requirements.

Sec. 74-46. – License regulations.

Sec. 74-47. – Solid waste license fee.

Sec. 74-48    Revocation

74-50  Failure to Obtain a License – Offense

*See* Westlake, Tex., Code of Ordinances ch. 74, art. III, §§ 74-41–74-48, 74-50 (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=CO OR_CH74SOWA_ARTIIICOSOWALIWAREMAOP.

## 2.    We set forth the points of agreement between the parties.

One apparent point of overall agreement between BRS and the Town is the view that Sections 74-43 and 74-47 of Ordinance No. 851 do not survive the supreme court's opinion.  These sections specify that a commercial solid waste operator must pay a fee and set forth the mechanisms to calculate and administer the fee.

---

punctuation and capitalization of the headings that are reflected in the text of the ordinance as it appears in Plaintiff's Exhibit 4 in the appellate record.  Neither the online version nor the exhibit contains a Section 74-49.

In addition, BRS's brief does not mention Section 74-41 of Ordinance No. 851 that merely provides, "Nothing in this Article shall be considered a waiver of the requirements of Chapter 36 and other Town requirements in regard to waste." *See* Westlake, Tex., Code of Ordinances ch. 74, art. III, § 74-41 (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=COOR_CH74SOWA_ARTIIICOSOWALIWAREMAOP_S74-41REOTORNOWA. Thus, we conclude that this provision is severable and survives.

Further, Section 74-42 provides a number of regulations dealing with solid waste, such as waste must be placed in an approved container; the waste must be contained to prevent the escape of odors and the container's contents; the area surrounding the container must be kept clear of obstructions; the container cannot be modified to be used for any other purpose than the collection of commercial solid waste; and the container must be in a safe, accessible location. *See* Westlake, Tex., Code of Ordinances ch. 74, art. III, § 74-42 (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=COOR_CH74SOWA_ARTIIICOSOWALIWAREMAOP_S74-42COSOWARE. BRS addresses Section 74-42 in a single paragraph:

> An example of regulation compliance without need of licensure can be found in § 74[-]42 of Ordinance No. 851. This section contains common[-]sense requirements such as placing waste in a designated container. It appears to be more applicable to the Town's trash customers who are served by Republic. Subsection (c) is inapplicable because it refers only to the Town's franchisee Republic. BRS owns its containers[,] so there is no possibility that it will alter or damage its

28

private asset for any purpose other than running its business pursuant to subsection (d). Similarly, BRS'[s] dumpsters are always located in safe, accessible locations as required by subsection (e). Again these provisions appear to be aimed at household and commercial customers of Republic. BRS complies with these common[-]sense requirements as a matter of course. *These provisions can be applied to BRS independent of licensure oversight by the Town.* [Emphasis added.] [Record references and citation omitted.]

We read BRS's statement as a concession that Section 74-42 survives a severability analysis.

### 3. We explain why we conclude that several sections of Article III of Ordinance No. 851 do not survive a severability analysis.

Moving beyond the apparent agreement and concessions of the parties, we are left with the basic question of whether Section 74-44 (License or franchise required), Section 74-45 (License application requirements), and Section 74-46 (License regulations) survive a severability analysis. In essence, the Town's severability argument relies on the contention that the licensing requirements are freestanding provisions directed at protecting the safety and welfare of the Town's citizens. At this point, such a contention is revisionist history. The record supports the supreme court's view that the licensing and fee provisions are not severable.

We begin our analysis by quoting the supreme court's view that it is unlikely that the licensing provisions will survive a severability analysis:

Here, the percentage-of-revenue fee was, by all accounts, an integral part of the Town's attempt to regulate construction trash hauling. From the beginning, the fee was a key issue in discussions between BRS and the Town about enactment of the [o]rdinance. The Town makes no argument that the other provisions of Article III should remain

29

operative if the fee is declared invalid. Indeed, the Town's primary defense of the fee is that its power to charge a fee is *indispensable* to its ability to regulate trash hauling at all. Every indication in the record is that the fee and the regulatory scheme were negotiated and enacted as a package deal. It therefore appears unlikely that the Town—contrary to its protestations of the fee's indispensability—would have enacted the other provisions of Article III in the absence of the fee. In particular, the prospect that the licensing requirement remains viable in the absence of its accompanying fee seems remote.

*BRS II*, 650 S.W.3d at 507. The record bears out the supreme court's surmise. Stated in terms of the traditional severability analysis, we conclude that after the invalidation of the fee provisions, the licensing provisions do not remain complete in themselves, are not capable of being executed in accordance with the apparent legislative intent, and are not wholly independent of that which was rejected.

We rely on the following broad points to support our conclusion:

- The Town conceded the close interrelation between the fee and the license provisions; the fee was justified by the need to administer and engage in oversight of the commercial solid waste operator. Thus, administration of the license was the justification for charging the fee, and it cannot be said that one is wholly independent of the other. In the supreme court's words, the fee provision was an "integral" and "indispensable" part of the Town's regulatory scheme. *Id.*

  Indeed, the Town's own witness tied the fee to enforcement of its ordinances. As the Town's representative testified on direct examination:

Q.  The license fee imposed in Ordinance [No.] 851 for temporary construction waste haulers, what is your understanding of what that license fee is designed to cover?

. . . .

A.  The administrative and oversight of the solid waste services that would include -- one of the things is construction waste much like the oversight for Republic Services.  It would include investigation on any issue regarding damage to [the Town's] streets, damage to any public or other private properties, any issues with blowing debris, discarded debris as a result of transportation of containers through the Town.  *It would also include investigation to identify the status of containers, the status of the licenses.*

. . . .

Q.  Based on your understanding of the amounts collected under the Town's franchise and licensing fees, has the Town of Westlake been made whole *as a result of the collection of those fees when compared to the cost to administer and enforce the ordinances?*

A.  No.  [Emphases added.]

That the Town was attempting to recoup its cost for administering the ordinances was a theme that carried over into cross-examination of the Town's representative:

Q.  With respect to BRS's activities, what specific expenses has the [Town] incurred?

A.  In addition to legal fees?

Q.  Sure.

31

A. The administrative and oversight that I provide over this, the cost for enacting the ordinance -- Ordinance [No.] 851 to accommodate [BRS's] opportunity to provide services in Westlake.

Q. Okay. So I heard two things: The cost to enforce the ordinance on BRS [is] administrative oversight; is that right?

A. The cost to administer the ordinance itself.

Q. Okay. So let's focus --

A. Investigation, driving, actually going around inspecting construction sites for compliance with the ordinance.

Q. Anything else?

A. The creation of the ordinance itself to accommodate [BRS's owners'] desire to operate within Westlake.

Q. I know the Town doesn't like that, but I don't think that's a cost of administering the license. That's what I'm trying to get to.

A. Okay.

Q. I heard there's administrative oversight is one item, correct?

A. Yes, which would include numerous items.

Thus, the fee and license operated hand in glove—the fee paid the cost of administering and enforcing the ordinances that contain the licensing provisions.

32

- Also, the Town's own documents demonstrate a view that the license fee was incident to the Town's ownership of the waste stream generated in the Town and tied both the regulation and the fee to that ownership. A workshop-discussion item from a Town council meeting sets out this view:

> It is important to remember that municipalities are in the solid waste business. The Town owns the solid waste stream and has a responsibility to ensure its proper disposal. In Westlake, much like most communities in North Central Texas, we outsource this service delivery to the private sector and "franchise" a provider.
>
> Two vendors have contacted Town staff requesting permission to operate within the Town. The Town's current Solid Waste Ordinance was drafted to address a single provider of solid waste services. The proposed ordinance includes some housekeeping/updates[;] provide[s] for the ability of solid waste provider alternatives, who would have to operate within established parameters to ensure the public health and safety of Westlake citizens[;] and includes a license fee of 15% to operate.

The legislative findings of Ordinance No. 851 carried forward the view that the waste stream was owned by the Town: "WHEREAS, the Town has the ownership of and responsibility for the waste stream and appropriate regulations are required under state and federal law[.]" As the supreme court made clear in its opinion, the Town's relationship to its franchised trash hauler is governed by a different statutory scheme than that defining the relationship between the Town and BRS, and the

33

Court indicated that nothing in its opinion should be construed to comment on the franchise relationship. *Id.* at 504. The Court did assume that Section 363.111 of the Health and Safety Code, which authorizes the Town to regulate solid waste, would permit the Town to charge "a regulatory fee." *Id.* But the Court also made clear that "[e]ven if that is the case, such fees would have to be tethered to the Town's costs of administering the regulation." *Id.* at 505. The Court would not countenance a fee based on the percentage-of-revenue measure that the Town imposed on a franchisee:

> A more conventional, volume-based fee under which the Town charged fixed amounts per license application or per construction site, for instance, could be calibrated to offset staffing or paperwork expenses incurred by the Town because of the regulation. But a floating, percentage-of-revenue fee will fluctuate based on economic forces having nothing to do with the Town's internal costs.

*Id.* (footnote omitted).

- The discussion item quoted above and the legislative finding set forth above support the view that the Town was attempting to impose the same type of regulation on BRS that it imposed on its franchisee and to replace the loss in its revenue stream that would occur when its franchised waste hauler was replaced by private entities such as BRS. In essence, the Town was imposing a regulatory scheme similar to that imposed on a franchisee as a means to justify the same revenue-

34

generating mechanism as that imposed on the franchisee. Thus, imposing a type of regulation in the form of the license as proxy for the regulations that could be imposed on a franchisee was a justification for the charging of the fee that replaced the revenue lost by a commercial solid waste operator's performing the service rather than the franchisee. This shows the integrated nature of the license and fee provisions but also suggests a negative implication with respect to the Town's intent— the Town would not have implemented the licensing scheme had it known the limited amount of the fee that it could impose.

- The supreme court also noted how integral the discussion of the fee was to that of the license: "From the beginning, the fee was a key issue in discussions between BRS and the Town about enactment of the [o]rdinance." *Id.* at 507. The record bears this out. As BRS's representative testified, the Town offered a lower percentage of revenue fee if BRS would accept the licensing scheme. The Town's representative confirmed that relationship:

> Q. And if he had acquiesced to a voluntary licensure participation, you and the City manager would have recommended the 3 percent fee to the [Town] council, correct?
>
> A. Yes.
>
> Q. And [BRS's owner] objected to participating in the licensure program, correct?

A. Yes.

Q. And the fee that was enacted as part of [Ordinance No.] 851 was -- instead of 3 percent was 15 percent of gross revenues; is that correct?

A. Yes.

- Finally, it appears that the Town used the licensing provisions as a stalking horse to justify the fee. As BRS emphasizes, many of the regulations imposed on BRS are duplicative of its existing duties under law or are not imposed on other types of large vehicles that use the Town's rights of way or on other contractors that present no greater risks to the public than those posed by BRS's business. Next, the Town allowed other contractors to register with the Town by paying a flat registration fee. Further, though the Town relied on administration of the license to justify the fee, when challenged, it could not correlate the two. Nor had it apparently done any on-site investigations to determine whether BRS was conforming to the licensing provisions. It appears that the Town attempted to justify the fee by claiming that it could often not identify the culprit in waste spills. In essence, the relationship between the licensing provisions and the fee is shown by the fact that the Town selectively imposed licensing requirements on commercial solid waste operators, used the cost of administering those ordinance

36

provisions to justify the fee, could not correlate the amount of administrative costs to the fee, and then could cite no efforts to ensure that the licensing regulations were being followed. Thus, the licensing provisions were not actually an effort to protect the safety and welfare of the Town's citizens but instead were a vehicle to justify the license fee.

With our overview conclusions in place, we briefly discuss the specific provisions that do not survive because they are not severable from the invalidated license-fee requirement.

Section 74-44(a) of Ordinance No. 851 states the requirement for a license as follows: "Commercial solid waste operators collecting, transporting, or disposing of commercial solid waste or temporary construction and demolition waste within the Town's corporate limits for compensation must obtain a license from the Town under this article." *See* Westlake, Tex., Code of Ordinances ch. 74, art. III, § 74-44(a) (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=CO OR_CH74SOWA_ARTIIICOSOWALIWAREMAOP_S74-44LIFRRE. This section also deals with the term of the license and its renewal. Obviously, our conclusion that the licensing requirement is not severable from the fee invalidates the requirement of a license.

Section 74-45 of Ordinance No. 851 mandates the form of the application for a license. *See* Westlake, Tex., Code of Ordinances ch. 74, art. III, § 74-45 (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=COO

R_CH74SOWA_ARTIIICOSOWALIWAREMAOP_S74-45LIAPRE. This section requires that an application include the following information:

(a) State the name under which the operator conducts business, the business address, and the telephone number;

(b) State the make, model, and body style of each motor vehicle to be used in the Town;

(c) Submit legally binding proof of liability insurance for the motor vehicles in the amounts required by law;

(d) Submit legally binding proof of insurance for the types of insurance and amounts of insurance required for Franchisee;

(e) Current customers, routes[,] and end destination;[10]

(f) Agree to abide by and be bound by the provisions of this article and to comply with all other federal and state laws applicable to the licensee's activities; and

(g) Submit any other information reasonably required by the Town to administer this article.

*Id.* Again, if the license requirement is not severable from the invalidated license fee, the application for the license does not survive. And as BRS points out, with the exception of describing the make and model of the vehicles that BRS uses and the undertaking to abide by "this article" and to submit unspecified additional information, the Town already obtains the required information via its contractor registration form. The duplication of the information required by the license application and the contractor registration form reinforces a view that the Town used

_____

[10]This subsection does not contain a verb denoting what action the applicant is required to do, e.g., "list."

the license as a justification for the fee, and that, in turn, reinforces how the two are interrelated and how each is not severable from the other.

Section 74-46 breaks down into two categories: various acts of compliance required of licensees and acts that the licensee must perform to maintain their licenses or to provide information to the Town. *See* Westlake, Tex., Code of Ordinances ch. 74, art. III, § 74-46 (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=COOR_CH74SOWA_ARTIIICOSOWALIWAREMAOP_S74-46LIRE. We will examine the latter type of regulations first because they clearly involve the invalidated license fee. Such regulations include the following:

> (j) The [T]own [M]anager or designee may examine the books, papers, records, financial reports, equipment, and other facilities of a licensee to verify compliance with this article.
>
> (k) Each commercial solid waste operator must keep for two consecutive calendar years all scale house tickets, receipts, invoices, manifests, and other documents evidencing the collection within the Town of commercial solid waste and the facility where the commercial solid waste was delivered.
>
> (l) Each commercial solid waste operator must submit monthly reports to the Town within 30 days following the end of each month. Said reports shall contain:
>
>> (1) Detailed by month showing the total commercial solid waste tonnage collected by the commercial solid waste operator during each month of the previous quarter;
>>
>> (2) That includes the list of names and addresses of the disposal location(s) of the commercial solid waste collected within the Town during the previous quarter;

39

(3) That includes the total amount of commercial solid waste delivered at each disposal location each month of the previous quarter;

(4) That show the gross revenues earned each month within the Town during the previous quarter;

(5) That includes, in table format, the customer's name, address, number of containers serviced, container type, size, and service schedule or on-call service; and

(6) That includes any additional reports reasonably requested by the Town for the time period requested.

*See id.* § 74-46(j)–(l). These subsections primarily deal with information that the licensee is to maintain and to provide the Town to ensure that the license fee based on gross revenue is properly calculated. The interrelatedness of these provisions and the invalidated license fee—calculated on the basis of gross revenue—is obvious.[11]

The remaining provisions of Section 74-46 are as follows:

(a) All licensees must prominently place clearly legible letters not less than five inches in height on both sides of the vehicles, containers[,] and

---

[11]Provisions (h) and (i) of Section 74-46 provide,

(h) All licensees must notify the Town of any change in the information submitted in an application for a license, including a change in the name, address[,] or telephone number of the licensee.

(i) All licensees must maintain their licenses issued under this article in compliance with the Town's ordinances.

Westlake, Tex., Code of Ordinances ch. 74, art. III, § 74-46(h)–(i) (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=CO OR_CH74SOWA_ARTIIICOSOWALIWAREMAOP_S74-46LIRE. Again, if the requirement for a license is invalidated, provisions requiring the updating of the information about the licensee and maintaining the license are swept away.

equipment that the licensee operates within the Town that identify the assigned number of each vehicle and the name and telephone number of the licensee.

. . . .

(c) All licensees' vehicles, containers and equipment must be well-maintained, in good repair, clean, sanitary, and free from leaks and excessive emissions.

(d) All licensees must contain, enclose[,] or tie all commercial solid waste and recyclable materials in a manner that prevents spilling, leaking[,] or blowing.

(e) All licensees must immediately clean up all leakage, spillage[,] and blown debris resulting from the licensees' vehicles or equipment.

(f) All licensees must maintain all vehicles, containers[,] and equipment in compliance with the laws and manufacturers' specifications.

(g) All licensees must maintain all required insurance during the term of the license[] and provide legally binding proof of said insurance upon request of Town Manager or designee[.][12]

*See id.* § 74-46 (a), (c)–(g).

It appears that these provisions form the crux of the Town's argument regarding why the licensing provisions of Ordinance No. 851 (carried forward into Ordinance No. 901) should survive a severability analysis. The Town defends the survival of the licensing provisions, shorn of the invalid fee, by arguing that they serve the purpose of protecting the health, safety, and welfare of the community. In

---

[12]Subsection (b) is excluded from the quotation because it deals with types of waste other than BRS hauls. Specifically, that subsection deals with recyclable materials.

essence, the Town argues that the presence of a legitimate purpose of the licensing provisions is borne out by the legislative findings in Ordinance Nos. 851 and 901. Specifically, the Town argues that

> [a]side from the sections creating the percentage-of-revenue license fee, all remaining provisions in Ordinance [No.] 851 are necessary for the Town's regulation of solid waste, which is necessary to promote the health, safety, and welfare of its community. The percentage-of-revenue-based fee notwithstanding, the remaining provisions provide for the collection and disposal of waste, and those provisions are fully capable of being executed without the percentage-of-revenue license fee.

We assume that the Town could require a license. That was our holding in our prior opinion, and our disposition of the issues on remand does not require us to revisit that holding. *See BRS I*, 640 S.W.3d at 560–64. But the view that the Town could require a license begs the question of whether the licensing provisions of the present ordinance—though they contain what appear to be health and safety regulations—survive the severability analysis. In essence, the Town is asking to roll back the clock and ignore the history of the licensing scheme and the apparent legislative intent tying the licensing provisions and the fee together. The Town also asks us to ignore that the health and safety regulations appear to have been designed to justify the fee, that the regulations are not imposed on others, and that the Town had not taken steps to monitor their enforcement. Thus, a clean slate might produce a different result, but the slate with the history of the ordinances and the intent tying

42

the license fee and license provisions together presents a different picture—one which does not warrant the severance of the licensing and fee provisions.[13]

### 4. We explain why Ordinance No. 901 does not survive a severability analysis.

At this point in our analysis, only Ordinance No. 901 remains unaddressed. In Ordinance No. 901, the Town made several legislative findings but substantively amended Ordinance No. 851 by reducing the license fee from 15% to 3% of the hauler's gross revenue.[14] The basis of the fee remains invalid because it is calculated on the basis of the operator's revenue. We see nothing in Ordinance No. 901 that impacts our preceding analysis that the licensing provisions of Ordinance No. 851 are not severable from the fee provisions. Indeed, Section 74-43 of Ordinance No. 901 confirms the relationship: "Each commercial solid waste transporter must pay a monthly fee to the town for use of streets, roadways[,] and rights-of-way. *Such fee is imposed with the objective of recovering the administrative costs of regulation, enforcement, monitoring, and the associated impact to infrastructure resulting from solid waste transport services*[.]" Westlake, Tex., Code of Ordinances ch. 74, art. III § 74-43 (2002),

---

[13]The remaining parts of Article III are Sections 74-48 and 74-50 (again, there is no Section 74-49). Westlake, Tex., Code of Ordinances ch. 74, art. III, §§ 74-48, 74-50 (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances ?nodeId=COOR_CH74SOWA_ARTIIICOSOWALIWAREMAOP. The remaining sections deal with revocation of a license and an offer for failure to obtain a license. As the requirement for a license has not survived a severability analysis, these provisions also fail as they are intimately tied to the licensing process.

[14]Ordinance No. 901 also reduced the late penalty for failing to pay the fee from 12% to 10%. *See* Westlake, Tex., Ordinance 901 (Dec. 2, 2019).

https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=COOR _CH74SOWA_ARTIIICOSOWALIWAREMAOP_S74-43FEPU (emphasis added). This provision explicitly ties the fee to the regulation of solid waste transporters, an aspect of which is the licensing provision. Again, the Town argues that the legislative findings of Ordinance No. 901 should survive and that they justify the licensing provisions of the solid waste ordinance. As we have noted above, the legislative findings do not persuade us to alter our severability analysis that invalidates the licensing provisions.

We sustain BRS's challenge to the ordinances' licensing provisions presented in its first issue because they cannot be severed from the invalidated license-fee provisions.[15]

---

[15]BRS's second, third, and fourth issues are as follows:

### ISSUE II

Whether the remaining severable sections of the Town's residential construction waste hauling ordinance should be deemed void as a result of the [s]upreme [c]ourt['s] striking down the percentage of revenue license fee provisions.

### ISSUE III

If the answer to Issue II is "No[,"] whether the remaining provisions of the waste hauling ordinance should be struck down pursuant to § 361.0961 of the Texas Health and Safety Code.

### 5. We remand the issue of attorney's fees to the trial court.

In its judgment, the trial court awarded BRS only ten percent of the attorney's fees that it had sought through trial and no fees for appeal. In our first opinion, we remanded the fee issue to the trial court so that it could "reassess its award of attorney's fees in the light of our ruling." *BRS I*, 640 S.W.3d at 573 (citing *Tex. Cent. R.R. & Infrastructure, Inc. v. Miles*, 635 S.W.3d 684, 690–91 (Tex. App.—Corpus Christi–Edinburg 2020) (mem. op.) (remanding matter to trial court to redetermine equitable and just fee award under Texas Civil Practice and Remedies Code Section 37.009 in light of appellate court's decision), *aff'd*, 647 S.W.3d 613 (Tex. 2022)). In view of the changed landscape created by our original opinion, that of the supreme court's opinion, and this opinion, the need for a reassessment has only increased. Further, the Texas Supreme Court instructed us to determine whether a remand was

---

### ISSUE IV

> If the answers to Issues II and III are "No[,"] whether the Town's general authority for regulating trash collection and hauling includes the power to adopt rules to require BRS to obtain an operating license.

It is difficult to correlate BRS's issues to its arguments as its brief does not note which of its arguments correspond to its four issues. With respect to the second issue, we cannot locate an argument addressing it. With respect to its third and fourth issues, they are in essence an effort to have us revisit our prior opinion. For the reasons we have stated, we will not do so. Further, as we read the supreme court's opinion, review of these issues on remand was contingent on a conclusion that the licensing provisions were severable from the license fee. *BRS II*, 650 S.W.3d at 507–08. We have concluded that the license provisions are not severable. Thus, we do not reach BRS's additional issues.

45

warranted to reassess the fee award in light of the subsequent events, and the parties agree that it is. *See BRS II*, 650 S.W.3d at 508 n.10.

Accordingly, we sustain BRS's fifth issue and remand this case to the trial court for a redetermination of the amount of attorney's fees to be awarded to BRS for trial and appeal.

## IV. Conclusion

As the basis for sustaining BRS's first issue, we hold that certain provisions of Article III of Ordinance No. 851 (which we referenced in Section III.C.3) are not severable from the license-fee provisions found in Sections 74-43 and 74-47 of Article III. Specifically, we invalidate Sections 74-43, 74-44, 74-45, 74-46 (except subsection (b)), 74-47, 74-48, and 74-50 of Article III. Our severability analysis also invalidates Ordinance No. 901. We do not reach BRS's second, third, and fourth issues. We sustain BRS's fifth issue and reverse and remand this matter to the trial court solely for a redetermination of both trial and appellate attorney's fees that BRS may be awarded.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: June 8, 2023

46